IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROD MARQUARDT,

      Plaintiff,

v.

STEPHEN KING AND SIMON &
SCHUSTER GLOBAL SERVICES, INC.,

      Defendants.

CIVIL ACTION NO.
1:10-CV-3946-JEC

### ORDER

    This case is before the Court on a motion to dismiss [11] filed by defendants, the author Stephen King and his publishing company, Simon & Shuster Global Services, Inc. For the reasons set out below, the Court grants defendants' motion to dismiss.

### I.  INTRODUCTION

    Plaintiff Marquardt has brought this copyright infringement action under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et seq.*). Plaintiff alleges that defendant Stephen King, in effect, stole from plaintiff's original literary work, _Keller's Den,_ when King created his own 2008 novel, _Duma Key_.

    Specifically, using the nom-de-plume "Rod Morgan," Plaintiff published his first and only novel _Keller's Den_ in 2002 with America

House Book Publishers. America House distributed the book in printed and electronic versions through online booksellers, including Amazon and Barnes & Noble. Shortly after publication, Plaintiff sent a copy of *Keller's Den* to King's publisher and co-defendant, Simon & Schuster, Inc., purportedly in the hopes that King would read the novel and write a blurb for the cover. Simon & Schuster, however, returned the book and informed Plaintiff that King did not accept other authors' books for review.

In 2008, King published *Duma Key*, one of some forty novels he has published since the 1970s. *Duma Key* appeared under the Scribner imprint of Simon & Schuster. Upon reading *Duma Key*, Plaintiff avers that he became convinced that certain elements of the novel were so similar to *Keller's Den* that King must have copied Plaintiff's work. That is, Plaintiff alleges that *Duma Key* is substantially similar to plaintiff's *Keller's Den* in "plot, plot devices, structure, sequence of events, setting, characters, characterizations, character function and relationships." (Compl. [1] at ¶ 12.) He provides a lengthy list of analogous details found in both novels. (See Compl. [1] at ¶ 12 and Pl.'s Supplemental Resp. [24] at 8-44.)

Plaintiff focuses most on plot similarities, alleging that the key plot idea for King's *Duma Key* came from *Keller's Den*. Plaintiff alleges that King copied his idea of a character gaining a sudden, uncanny ability to paint as a result of contact with some

2

supernatural being. (Compl. [1] at ¶ 12(c), (kkk).) The supernatural being shapes the subject-matter of the paintings, often to depict things previously unknown to the character. (Compl. [1] at ¶ 12(f).) Further, bad things start to happen to the painter and to other characters who come into contact with the paintings.

Defendants, who will hereinafter be referred to in the singular, as "King," have moved to dismiss this action pursuant to FED. R. CIV. P. 12(b)(6), arguing that the only similarities between the two works "are abstract ideas, stock elements and random similarities isolated from the expressive context in which they appear, none of which are protected by copyright." (Defs.' Mot. to Dismiss [11] at 1.)

For the reasons set out below, the Court has concluded that the similarities alleged between the two books clearly fail the Eleventh Circuit's test for "substantial similarity," which requires the alleged similarities of copyright-protected material to be such that "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir. 1982)(quoting *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092-93 (2d Cir. 1977)). Thus, because Plaintiff fails to state a claim upon which relief may be granted, the Court grants King's motion to dismiss Plaintiff's copyright action.

3

**II. <u>Applicable Law</u>**

    A.   <u>Elements of Copyright Infringement</u>

To succeed on a copyright infringement action, the plaintiff must show that he holds a valid copyright to the elements of the work alleged to be copied, and that there was actual copying of those elements. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994). As copying is difficult to prove directly, courts--including the Eleventh Circuit--have employed a two-part test for determining whether one can infer that copying occurred. *See, e.g.*, *Original Appalachian Artworks*, 684 F.2d at 829. First, the court asks whether the defendant had access to the plaintiff's work. *Id.* Second, it asks whether "the defendant's work is substantially similar to the plaintiff's." *Id.*

The test of substantial similarity itself has two independent prongs. The works in question must satisfy the "extrinsic, objective test" of being "substantially similar in protected expression." *Lil' Joe Wein Music, Inc. v. Jackson*, 245 Fed. Appx. 873, 877 (11th Cir. 2007). That is, a plaintiff cannot prevail if he seeks to protect only uncopyrightable elements. Further, under the extrinsic test, expert testimony may be considered. *Id.* (citing *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1257 (11th Cir. 1999)).

Second, the plaintiff must also meet the burden of the "intrinsic, subjective test," which requires a showing that "a reasonable jury would find that the works are substantially similar." *Id.* Stated another way, the test asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Original Appalachian Artworks*, 684 F.2d at 829. Too much should not be made of the extrinsic/intrinsic distinction, however, as "the two tests ultimately merge into a single inquiry: whether a reasonable jury could find the [two works] substantially similar at the level of protected expression." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1224 n.5 (11th Cir. 2008).

For purposes of his motion to dismiss, King concedes that Plaintiff has a valid copyright to <u>Keller's Den</u> and that King had access to the novel. Nor does King challenge, at this point, Plaintiff's satisfaction of the extrinsic test of substantial similarity. Thus, the only question at issue for King's motion to dismiss is whether the two works satisfy the intrinsic test of substantial similarity.

B.   <u>Applying the Intrinsic Test of Substantial Similarity</u>

Under the intrinsic test, "'[s]ubstantial similarity' exists where 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Original*

5

*Appalachian Artworks*, 684 F.2d at 829. In applying this standard, the Eleventh Circuit disfavors the use of catalogs of similar elements, as "such lists are 'inherently subjective and unreliable,' particularly where the list contains random similarities...[because] [m]any such similarities could be found in very dissimilar works." *Beal*, 20 F.3d at 460 (quoting and affirming *Beal v. Paramount Pictures*, 806 F. Supp. 963, 967 n.2 (N.D. Ga. 1992).

That is, in determining substantial similarity, a court seeks to mimic the mental process that typically occurs when a person reads. A reader of a novel does not, as she is reading, typically expend her energy compiling mental lists of the various dates, places, characters, and events set out in the book. Reading is not akin to playing a parlor game. Thus, the lay person reads novels, not as aggregates of facts, but as coherent wholes. For this reason, the Eleventh Circuit favors an approach that better captures what a lay reader actually experiences, and therefore it analyzes the works at issue in terms of holistic categories, such as "plot, characterization, mood, pace, and settings." *Beal v. Paramount Pictures*, 806 F. Supp. 963 at 967-69.

Failure to meet this intrinsic test for substantial similarity has long been recognized by the Eleventh Circuit as fatal to a plaintiff's claim. *E.g.*, *Beal*, 806 F. Supp. at 967; *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999).

6

Understanding how the Eleventh Circuit actually applies what seems to be a rather abstract test is illustrative in analyzing the present case.  In *Beal*, which involved a complaint for copyright infringement similar to Plaintiff's, the Eleventh Circuit affirmed the district court's summary judgment for the defendant for lack of substantial similarity under the intrinsic test. That is, the court adjudged the defendant's movie *Coming to America* insufficiently similar in protected expression to the plaintiff's book *The Arab Heart*, despite both books sharing the common idea of an African prince leaving his kingdom to come to America, where he ends up falling in love with an American woman, eventually marrying her, and bringing her back to his kingdom.  *Beal*, 806 F. Supp. at 967-69; 20 F.3d at 460-64.

   The court found crucial dissimilarities in that the plots diverged, the events that led each prince to leave his kingdom for America were different, the plot complications in America were different, and the resolutions of the stories were different.  The court likewise found the characterization in each work to be different, in that *The Arab Prince* featured an unrepentant womanizer as a prince, whereas *Coming to America* featured an idealistic, pure-hearted prince.  Likewise, the settings were different. The African kingdom in *Coming to America* was an idyllic paradise, whereas the kingdom in *The Arab Prince* was racked by war.  Further, in *Coming

7

*to America*, the prince lives in Queens, New York; in *The Arab Prince*, the prince studies at the Georgia Institute of Technology in Atlanta.

Thus, despite a broadly similar idea underlying both works, the lay reader would not find the works substantially similar, and the intrinsic test was not met. The Court will use a similar approach to analyze, and compare, the two works at issue.

**III. DISCUSSION**

Analyzing *Keller's Den* and *Duma Key* through the *Beal* categories of "plot, characterization, mood, pace, and settings," it becomes quickly obvious that they share no substantial similarity that would be recognized by a lay reader.

  A.  Plot

Plaintiff's work, *Keller's Den* is essentially a religious allegory of fall and redemption. The major plot device is a three hundred year-old family curse that allows a malevolent force (suggested to be Satan) to possess its members, causing them to commit heinous acts. The curse arose out of an intra-familial fight, in which members of the Keller clan crucified and burned alive the family patriarch, Savov. In his dying moments, Savov abandoned his religious faith and "vowed revenge, unaware that his promise had subjugated him to a dark force where his unsettled

8

spirit would embark on a sinister path of kindred torment." (Notice of Ex. A and Ex. B [12], Ex. A at 10.)

The protagonist of the novel, Martin Keller, is the latest Keller to suffer from the curse. The curse first manifests itself when Martin takes up painting--rapidly and mysteriously becoming proficient in rendering realistic scenes--and then begins having hallucinatory experiences in which he is transported into the scenes of his paintings, in one instance almost drowning when he is taken into an underwater diving scene. The curse soon drives Keller to do terrible things, including rape and murder, before he manages to defeat the curse with the help of his newfound religious faith, thereby bringing redemption to the Keller line. This redemption is symbolized at the end of the novel with the birth of Keller's son, who is presumably the first Keller to be free of the family curse in three centuries.

Defendant Stephen King's book, *Duma Key*, is primarily a psychological novel. Its plot centers upon Edgar Freemantle, who runs a successful Minnesota construction firm until a crane falls on him, causing him to lose his right arm and leaving him brain-damaged. At his psychiatrist's suggestion, Edgar moves from Minnesota to the Florida island of Duma Key, where he takes up painting as therapy for the depression brought upon him by the accident. He quickly demonstrates an uncanny skill at it, having

9

never shown much artistic proficiency before moving to Duma Key. Edgar often composes his surreal paintings while in a daze induced by his brain damage (and, as later becomes apparent, an evil spirit that inhabits the island). The depictions--not understood at first--end up revealing things about his ex-wife (that she had developed a romantic relationship with their accountant), daughter (that she is engaged), and the island, itself (that it is haunted).

His paintings also have the power to change reality. In one instance, Edgar is able to remove a bullet lodged in a friend's brain by painting a picture with it removed. The paintings, however, have a malign effect on those to whom Edgar gives them, as their possessors either die or are driven to kill others. Gradually, it becomes clear that Edgar's paintings have released Perse, the evil spirit of the island, whom Edgar must then confront. He succeeds in vanquishing Perse after investigating the island's mysteries and learning of her weakness (submersion in fresh water).

Thus, the plots, while sharing the idea of a mysterious, dangerous painting skill, express that idea quite differently. In *Keller's Den*, the idea is expressed in the context of a religious allegory of possession and salvation. In *Duma Key*, the idea appears in the context of a psychological mystery. Accordingly, the painting skill functions differently as a plot device in the two books. In Keller's Den, it is little more than a manifestation of

10

Martin's demonic possession. In Duma Key, it is employed to connect Edgar to the island's history and its other inhabitants.

B.  Characterization

Martin Keller is, it seems, an otherwise ordinary and decent person possessed to do evil things by his family curse. His psychology is only thinly developed in the book, as he experiences the world in a rather clipped, typical fashion:  his sex life is presented as a simple cycle of desire and satisfaction; his fits of demonic possession send him into a pure, sadistic rage; after such fits he feels nothing but puzzlement and remorse. The same is true of the other characters in *Keller's Den*. Martin's grandfather, who murdered dozens in an arson attack, and his father, who stabbed Martin's mother to death, serve to illustrate the moral corruption the curse brings to the Kellers. His girlfriend, Janet, stands by as the steadfast companion, waiting for Martin through his tribulations. Father Sherman, representing the Catholic Church, is the stalwart opponent of Martin's demonic possessor.

None of these characters, however, shows any depth, or even idiosyncrasy, of personality. Such thin characterization is typical of allegorical works, which are well-served by generic characters who do not clutter the allegorical message.

On the other hand, Edgar Freemantle is a man deeply depressed as a result of his accident. He narrates the novel in the first

11

person point of view, and thus the reader shares in his depressing thoughts, as well as the mental limitations caused by his brain damage.  This device gives the novel a twist on the classical psychological mystery.  Admittedly, the unreliable narrator is a stock in trade of such stories, but usually because the reader cannot trust the narrator's honesty or sanity.  Henry James' *The Turn of the Screw* is a paradigm of this narration device.  In *Duma Key*, however, the narrator is unreliable because of the mental fog that often obscures his thinking.  This means that much of the reader's work involves coming to terms with Edgar's mind as an imperfect lens through which to understand his troubled relationships with his ex-wife and daughter, as well as the mysterious events on the island.

The characterization in the two novels is thus quite different.  Martin is the everyman, representing the typical situation of humanity in a fallen world, albeit it in extreme form.  The reader encounters Martin, as well as the rest of the characters in the novel, as set-pieces in a well-trod allegory of original sin and rebirth through faith.  In contrast, Edgar is a protagonist in the tradition of the psychological novel.  As such, the depth and atypicality of his character is essential to the book's literary effect, as the reader interprets the events in the novel from the particular vantage point of Edgar's psyche.

12

C.   Mood and Pace

Although both novels belong generally to the horror genre, they offer very different moods and pacing. *Keller's Den* is driven more by action than suspense. It proceeds at a rapid pace, with short chapters (some as short as half a page) and narration that jumps among characters, almost always to one involved in some scene with dramatic action. The lack of suspense is reinforced by the fact that all the major themes of the story are presented at the outset. The third-person omniscient narration of the novel assures that the reader will recognize these things immediately. The Prologue introduces the reader to the curse, and the first sentence of Chapter 1 ("Something intrinsic and peculiar stirred within the soul of Martin Keller.") indicates to the reader that Martin is its next victim. (Notice of Ex. A and Ex. B [13], Ex. A at 11.)  When Plaintiff has Martin discover the nature of his affliction, he does so directly and efficiently, by having the elevator on which Martin is riding take a sudden descent into hell, where a demon tells him all about the Keller curse. Likewise, when plot complications emerge, they are quickly resolved, as is the case when Martin rapes his secretary, and later that day is forgiven by her, all within the space of twelve pages. The minimal character development, short chapters, and conventional plot, free of suspenseful misdirections,

13

allows Plaintiff to push the 254-page story to its conclusion at a rapid pace.

In contrast, *Duma Key* is a novel that creates suspense, fear, and mystery through the exploration of the protagonist's psychology. It proceeds at a gradual pace, as Edgar wrestles with his past and his disability, and slowly learns the story of the island and its evil spirit. For most of the novel, the reader cannot even be sure that there is anything supernatural at work, due to the possibility that any unusual event has a rational explanation obscured by Edgar's mental condition. Only late in the 607-page novel is Perse, the evil spirit of the island revealed, at which point the story shifts to a pace more akin to the dramatic action style employed throughout *Keller's Den*.

Further restraining the pace and heightening the suspenseful mood are the numerous lengthy diversions from the action of the narrative, including explorations of the lives of Edgar's Duma Key neighbors, such as Elizabeth Eastlake, an old lady who, albeit stricken with Alzheimer's Disease, knows more about Duma Key and Perse than anyone, and Wireman, an ex-lawyer turned caretaker to Eastlake.

D.  Settings

Finally, the novels are set in very different locations. *Keller's Den* takes place primarily in upscale, urban Miami. As

14

Martin is a successful stockbroker, the story unfolds in high-rise office buildings, yachts, and Martin's fancy home, though there are scenes set in less glamorous locations, including a mental institution.  In contrast, *Duma Key* is set primarily on a small, sparsely inhabited island on Florida's Gulf Coast.  Edgar's vacation residence, "Salmon Point," is a quaint, pink-painted cabin he nicknames "Big Pink."  In fact, little on the island seems contemporary, but rather the site is stuck in some bygone, even primordial, era, as illustrated by the fact that the island's vegetation grows at an unnaturally rapid rate, threatening to swallow the man-made structures.  The novel is bookended with scenes set in Minnesota, which is likewise far from the urban Miami of *Keller's Den*.

Thus, while both works feature the idea of a newly discovered painting skill connected to some ancient evil, each work expresses that idea in very different ways.  At the risk of judging books by their covers, it is notable that *Keller's Den* features a burning cross superimposed on a painter's canvas, whereas *Duma Key* features a stormy beach scene with seemingly random objects (including a tennis ball, frog, and harpoon-gun) leaping from a canvas hovering over the shore.  Such contrasting images capture well the dissimilar structures and feelings evoked by the two texts.  *Keller's Den* is an unsubtle narrative: transparent and direct in its literary

15

devices and message, all of which stand out much like the flaming cross on the cover. *Duma Key*, on the other hand, is a mystery that strews puzzle-pieces throughout the novel, only showing how they fit together after the reader is deep within the work.

In short, *Keller's Den* and *Duma Key* clearly fail to meet the Eleventh Circuit's intrinsic test for substantial similarity.

### IV. **Appropriateness of Dismissal Pursuant to Rule 12(b)(6)**

There is some dispute between the parties as to whether the court should grant a Rule 12(b)(6) motion to dismiss on the basis of the intrinsic test, even where the court has found the plaintiff to have failed that test.

Plaintiff argues that the question of substantial similarity is better left to a jury. In addition, he notes that the Eleventh Circuit has yet to affirm a 12(b)(6) dismissal on the basis of the intrinsic test.

Defendant King, however, argues that there is no reason to await a summary judgment motion before dismissing the action, and notes that there are good reasons for dismissing the action without discovery. First, King cites to numerous courts in other circuits that have granted 12(b)(6) dismissals for failing the intrinsic test. *(See, e.g.,* cases cited in Defs.' Reply Mem. of Law [23] at 5-9.)

16

Second, the Eleventh Circuit has affirmed summary judgment, often with only minimal discovery permitted, on the basis of the intrinsic test. *See Herzog*, 193 F.3d at 1247 ("[N]on-infringement may be determined as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.").

Third, the nature of the intrinsic test is such that discovery is irrelevant, as there is nothing to discover that could reasonably inform a decision as to whether a lay reader would discern substantial similarity. Because both novels are included in the pleadings, and the intrinsic test looks only at the works in question, no additional facts produced at discovery would be relevant to the intrinsic test. Thus, notwithstanding the lack of Eleventh Circuit precedent, this Court concludes that dismissal pursuant to Rule 12(b)(6) is warranted, and the Court grants the defendants' Motion to Dismiss [11].

## **CONCLUSION**

For the above reasons, the Court **GRANTS** defendants' Motion to Dismiss [11].

17

SO ORDERED, this <u>9th</u> day of August, 2011.


                                        <u>/s/ Julie E. Carnes</u>
                                        JULIE E. CARNES
                                        CHIEF UNITED STATES DISTRICT JUDGE